Good morning. May it please the Court, my name is Joy Herr-Cardillo. I'm with the Arizona Center for Law and the Public Interest, representing the plaintiff here. I recognize I keep my own clock, but I'd like to reserve some time for rebuttal, so I plan to stop early. At the outset, one of the things I'd like to emphasize to the Court is that although this case specifically challenges the festival ranch permit, it really has implications well beyond that master plan community. As we developed in the facts and the record in this case, the West Valley in the Phoenix area is undergoing tremendous development and is in the process of seeing permit applications for, at the time that the EA in this case was being reviewed by EPA, they were able to identify at least ten other master plan communities that were in the process of obtaining 404 permits in the West Valley area in that Hacienpa watershed. So clearly what the EA, what the Court, excuse me, did with the festival ranch EA and what this Court rules with respect to that approach and analysis is going to have implications on all of those other EAs or permits. And this was something that EPA recognized. We get beyond economic times. True, true. That may have slowed things down. That's correct. But EPA recognized this early on in this process, and again, we've developed this in the record, that EPA made numerous overtures to the Corps drawing to their attention the problems that this massive development presented, particularly with respect to air quality. That was a big concern because this project and that Buckeye Valley, I call it West Valley and Buckeye Valley, but it's the same thing. Sorry, I'll try to be consistent here. But at any rate, is both in the ozone nonattainment area and immediately adjacent to the particulate matter nonattainment area. And that particulate matter continues to be a very severe problem for the Phoenix area. So EPA made every effort, numerous efforts, to reach out to the Corps to engage the Corps in some systematic, comprehensive planning to either do a programmatic EIS for that entire West Valley, but at a minimum for these big, big projects to recognize that they've passed that threshold, that significance threshold, and should have an EIS, a full EIS prepared. Unfortunately, the Corps rebuffed those efforts on the part of EPA and instead appeared to go out of its way to limit its environmental analysis of the Festival Ranch Permit and the Tartesso West Permit, which we referenced tangentially, but here specifically with respect to the Festival Ranch, which is at issue before this Court. Isn't it true that at least some of the Festival Ranch Project could be developed without a 404 permit? That probably is true, Your Honor. We don't know because the Corps never really did that analysis. In trying to avoid the holding, what appears to be their attempt to avoid the holding of the Save Our Sonoran decision and the expansive view of the scope of analysis that the EPA was urging, the Corps adopted this sort of unusual approach to determining its scope of analysis. What it did is instead of looking at, well, let's look at this Festival Ranch proposed project and let's figure out what portions of this project do require a 404 permit, instead the Corps kind of latched on to the discussion in Save Our Sonoran where the Court recognized that the property, the unique property in that case, was so unusual that it couldn't be subject to any development without a 404 permit and then kind of segued from that to adopting the no-action alternative as the basis for determining, in this case, its scope of analysis. So it's sort of, instead of looking at, okay, what are the impacts of this project, the Corps ended up looking at, well, if we didn't issue any project or any permit, what does the property require in order for it, what portions of the property absolutely require a 404 permit to be developed? So, in essence, kind of took that no-action alternative and used that as the basis. And I'm sorry, I can see the confused look on your faces. It is very hard to follow, and I have spent hours looking at trying to figure out how did they get to that point where they justify their scope of analysis by that no-action alternative. But that's what they did. There's nowhere in that EA where they actually look at, okay, let's look at this festival ranch project and let's see, here's a golf course that cannot be developed without a 404 permit. That's going to be within our scope of analysis. Here's a residential block that cannot be. They never performed that sort of analysis. Instead, they got very hypothetical and abstract and just decided to confine their analysis to just the jurisdictional waters and 83.6 acres of land that could not be developed under any scenario. Let me ask you a question. I was a little perplexed by it. Because apparently one of the constraints here, at least as the developer saw it, was the plan of Buckeye. Right. And the developer said in its analysis of the alternatives and the no-action alternative that it couldn't do that because it was inconsistent with what it defined as the no-action alternative. It was inconsistent with the Buckeye plan and that it would have to have 404 jurisdictional land in order to comply with Buckeye or something like that. Is that right? Well, I think that part of the project purpose was defined as developing a master plan community consistent with the Buckeye Valley plan. And the problem with the no-action alternative and why that was rejected under the alternatives analysis was that it didn't comply with the Buckeye plan. So whether they would even be allowed to build it or would have to seek amendments to the plan wasn't, I don't believe, really addressed. No, but what the bottom line there was that they weren't considering it because they couldn't do it and that meant that they had to use the, if I understand it, what flows from that is that they had to use the jurisdictional land. Correct. That subjected them to some kind of EA because in order to comply with Buckeye. Right. That was part of the justification. I mean, one of the tensions in all of this analysis is that you start with the presumption that a 404 permit being a licensed pollute is only going to be granted if there are no practical alternatives. And so developers historically have always, you know, gone through demonstrations to show how there are no other practical alternatives in order to convince the court that they should, in fact, issue the permit. But with the Save Our Sonoran acknowledgement by the court or justification by the court that the expansive scope of review was tied to the fact that the property couldn't be developed without a 404 permit, suddenly the developers are wanting to dial back on that alternatives analysis. Right. So you can see the tension there. So at any rate, the other problem with the scope of analysis, notwithstanding kind of the way the court got to that scope, is that the court didn't consistently use the same scope of analysis as its regulations require to evaluate both the alternatives and the benefits of the project and the environmental impacts. And that's something that the rules promulgated, the regulations promulgated by the court itself, say that in all instances you've got to use the same scope of analysis, which makes sense because it's not fair to limit your analysis of the negative impacts and then have this expansive view of how wonderful this project is going to be for the economic benefit of the Buckeye Valley and also for the alternatives analysis. They didn't confine the alternatives to other ways that they could fill the 26 acres. They looked at other ways to develop the entire parcel. So that is problematic. And our position there is, and we spell this out in the brief, is we think the scope of analysis was too narrow. But even if this court determines, no, the scope of analysis was appropriate or was not an abuse of discretion. Well, that really isn't our question, is it? I mean, isn't the issue whether or not it was arbitrary or capricious? Or an abuse of discretion, yes. Or an abuse of discretion. And a very distinguished district court said, well, no, it wasn't an abuse of discretion or arbitrary and capricious. So if you could just nail it as to what exactly was arbitrary and capricious about the scope that was chosen, I'd appreciate it. Sure. Well, if I can just point out, this is de novo review. So this court. Well, yes, but it's de novo review of the district court. Correct. Yeah. But we're reviewing the agency. The problem is that it's arbitrary and capricious because the rule applied by the court was not consistent with the Save Our Sonoran decision. In Save Our Sonoran, this court directed that the scope of analysis is determined by the impact of the development on the jurisdictional waters. And then the scope of the NEPA analysis is determined by the impact that the permit has on the environment at large. And the court abused its discretion because in determining the scope of analysis that it used in its EA, it didn't consider the project at all. It simply looked at the property. That's the problem. And the project was what, a community? A master-planned community. Of 10,000 or? I think it's 16,000 acres. Or no. I'm terrible with numbers. I'm trying to think of people. But I think it's 16 square miles. It's huge. It is the largest master-planned community proposed for Arizona ever. So it is a huge project. Now, how do you distinguish the wetlands case? The wetlands case? I don't distinguish the wetlands case so much as I see the property in wetlands as one end of a continuum and the property in Save Our Sonoran as the other. But I think that the two cases can be reconciled, Save Our Sonoran and wetlands. If you look at the fact that in wetlands you had the fill project was very discreet. And the project, the overarching project, was able to move forward even while the wetlands portion of the project was stayed. In Save Our Sonoran, the court looked at that property and said there's no way any development can go forward on any aspect of that property without a 404 permit. So the cases basically, both cases, talk about looking at the proposed project and figuring out what portions of the proposed project require a 404 permit and that being what defines your scope of review. Thank you. I'd like to talk briefly also about the cumulative impacts analysis because I think in this particular case the EA was woefully inadequate. And I think, first of all, the court just is simply incorrect when it attempts to argue that it doesn't have to consider those other proposed mega-developments in its cumulative impacts analysis because it doesn't have control over those. The regulations are very clear that in evaluating cumulative impacts, the agency needs to consider all of the potential impacts of regardless of who is responsible for the reasonably foreseeable developments. So the fact that the court doesn't have control over those projects is not an excuse not to factor those in in the cumulative impacts. And I also think that the reliance by the government and the court below on the public citizen case, the Department of Transportation v. Public Citizen, is misplaced because it's very clear that in this case, this information that the court would be getting by doing a full cumulative impacts analysis on what the impact of this project as well as all those other projects are going to have in the West Valley, that information is information that the court here can act on as part of its public benefit analysis in issuing the permit. So it's not a situation where the agency doesn't have discretion to act on the information. And then finally, and I spend some time on this in the brief, and I think it's critically important, is the fact that the court just dismissed EPA's concerns about air quality with respect to the cumulative impacts of all of these projects. I mean, EPA is a sister agency but is also the agency responsible for air quality management in this country. And EPA pointed out numerous problems with the court's analysis, including the fact that the court was relying on outdated data, and the court simply dismissed that. How did the district court deal with that? Do you remember? I believe that the district court, I'm not sure, but my recollection is the district court held that the cumulative impacts analysis was okay under public citizen. I don't recall any discussion in that opinion. I'm sorry about the air quality issue. And then finally, because I do want to reserve a little bit of time, the third problem with this analysis is the failure to do the EIS. As EPA urged, this is a huge project. Even in a limited, with the court's limited scope of review, we're talking about filling 26 acres of wetlands. And that is just a huge portion of property. And I think that the fact that the court dismissed the EIS, I don't recall any discussion in that opinion. An area where there aren't a lot of wetlands. Yes, very true, Your Honor. So with that, I'll leave the remaining time for rebuttal. Thank you. May it please the Court. I'm Mark Hague from the Department of Justice for the Corps of Engineers. To start, I want to clarify, we're not talking about wetlands here. There are no wetlands on this site. I understand it's not wet. Okay. The issue, the agency action that's being challenged here is not the approval of a 10,000-acre project. It's the approval of a permit to fill 26.8 acres of ephemeral washes. The permit was issued in conjunction with the larger project,  Initially, the developer sought permission to fill about 47 acres of ephemeral waters, but as part of the Clean Water Act public interest review process, the Corps negotiated a reduction of the fill to 26.8 acres. The permit also requires the developer to preserve in perpetuity all of the remaining jurisdictional waters on the property. So that's 760 acres or over 96% of the waters of the United States on the property that will be preserved, plus about 260 acres of uplands that will serve as buffer zones. I will just briefly touch on standing, Your Honor, because that was raised in the district court and below. And the issue here is really a very simple, factual question. To establish standing, a plaintiff has to allege and provide appropriate support for a claim of injury as a result of a government action. There's no evidence of an injury caused by the government here. And if the Court looks at the Benelli Declaration in the excerpts at page 183 to 185, you'll see that there's just a failure of proof on this issue, and that's the basis on which the district court held that White Tanks had not met its burden to establish standing. Turning to the NEPA issue, White Tanks argues that the Corps' NEPA analysis was too narrow because the Corps' jurisdiction under the Clean Water Act extends to the entirety of the proposed festival ranch development area, which includes about 9,300 acres of uplands. But the agency action here, again, is the permit, not the entire project. Ginsburg. Yes. Well, it's not the entire project, but as I read the record, there are at least 10 reasonably foreseeable residential development projects in the Hacienda River watershed requiring a 404 permit. What's the justification for not analyzing them all together, the cumulative impact? Well, they are – those are addressed in the cumulative impacts analysis. But in terms of determining the scope, the way that the process works for purposes of NEPA under the Corps' NEPA regulation is the agency looks at the effect of its action on jurisdictional waters, then the action being the permit, jurisdictional waters plus additional areas that are within the control and responsibility of the agency. And then it does – it analyzes the direct, indirect, and cumulative effects of that permit decision. When it gets to the cumulative effects stage, it has to look at this permit against the background of these other actions that have taken place in the past or are reasonably foreseeable in the future. So that's when the consideration of the impacts of those other projects come in. So I'm not really clear. At what point are the cumulative impacts assessed? At the time the EA is written? Yes. They are discussed in the EA, and they factor into the agency's determination of whether the permit will result in finding of no significance. But to me, and it's probably somewhere in the record, that part of the EA that quantitatively assesses the cumulative impacts, where in the EA are those cumulative impacts assessed? I would say a good place to start would be page 145 and 155 of the excerpts of record, page 112, page 117, page 173. All right. I will check those out. I was hoping you might be able to point to me specifically, but it's in various parts of the record, I think. I have the EA here. Right. And I guess in assessing the cumulative impacts, the EA explains that Maricopa County as a whole is 5.9 million acres. As a way of putting this in context and the impact of these, these are large developments. Maricopa County is a large county, 9.5 million acres. The western part of Maricopa County, the area around the White Tanks Mountains, is a million acres. Of those million acres, 20,000 to 30,000 acres are ephemeral washes. So this is not a rare type of habitat. The CORS permits, well, so it constitutes. I know statistically what these are, but they're environmentally quite important. That's. You can talk about this. It's huge. Maricopa County is bigger than the State of Connecticut. But there are also large problems, environmental problems in building in an environment like that. That is true, Your Honor. And the Corps of Engineers, since 2001, has authorized fill in connection with a number of these developments that are listed. The total amount of fill that's been authorized since 2001 is 480 acres, 480 acres out of a base of 20,000 to 30,000 acres. So that's a relatively small percentage, less than 0.4%. The additional. If you drive through those acres and look at the smog coming up, it's not de minimis. Well, I guess that smog raises an additional issue, Your Honor, because this is not a Clean Air Act permit. I understand that. And the Clean Air Act permitting is the responsibility of the State that's been delegated implementation of the Federal. I fully understand. So in terms of the cumulative impact analysis, the NEPA analysis is intended to inform the agency decisionmaker about the impacts of the agency decision. And the agency decision here is not to build a 10,000-acre development. It's to authorize 26.8 acres of fill. And then having so and the Court's regulations and this Court's decisions in Wetlands Action Network and Save Our Sonoran support that view, that analysis. But assuming for a moment that the development can't be met without filling, can't be, the project can't be done without filling in this fill, then you are, in effect, approving the project. I mean, we play kind of a word game when we say you're only approving this 26 acres. Because if the project can't be built without filling that in, then that's the ---- That's right. And that's what Save Our Sonoran says. That's right. If you can't develop the property without a 404 permit, then ---- And that's what the Court's regulations say. That's right. Then you have control and responsibility. And what Wetlands Action also says is that to the extent you can develop the property, even if it's not the proposed project, without a 404 permit, then those portions of the property ---- Yes, and that's why we're here. And that's our problem is in how to apply those different scenarios. Right. And I think you would agree that they're kind of ---- Would you agree with the appellant that they're kind of a continuum here? Yes, yes, I do. I do. And we're not taking the position that one is wrong and the other is right. Right. I guess I would take issue with some of the characterizations of the facts in Save Our Sonoran. The way that Save Our Sonoran characterizes the facts of Wetlands Action Network, I think it's important to go back and look at what the Court actually said in Wetlands Action Network, because it was not the case that the fill in Wetlands Action Network was exclusively a separate part of the property and a separate phase of the project, but you could get that impression from reading Save Our Sonoran. I think it's also interesting and worthwhile to note that the district court here, Judge Bolton, is the same judge who decided Save Our Sonoran. So she is plainly aware of this issue of control and responsibility, and she looked at the facts in that case in the context of a preliminary injunction appeal and said, based on the map, and I supplied the Court with a copy of the – a color copy of the map of the property that was issue – at issue in the Save Our Sonoran case. It's this color page with the blue lines. This is what Judge Bolton and the – Yeah. You got a map of blue and red lines? I'm sorry. They're blue capillaries. They're blue capillaries, right. I guess it's – or blue lines through graph paper. Blue precincts and red precincts. So the distinction here, it's really a factual distinction. It's a factual analysis that Judge Bolton was aware of. And she saw that there was a distinction in this case, that this case is not like as a factual matter, not like the facts in Save Our Sonoran. And I also – you know, the Court has a copy of the entire administrative record on DVD, and all the maps that are in the record are on the DVD. If you open the DVD and click on the index, the index hyperlinks to all of the record documents. So it's possible to look at all of these maps and to zoom in on them because they're very – Well, I'm not sure they tell me very much. Well, I guess one thing that they tell, I would refer you to the third page of the yellow color copies. And to compare that to the Save Our Sonoran capillaries, the box that's this cube or the square that's got the number 15 in it. And I apologize, these colors are not – the contrast is not that great. But in that third page, this is page 931 of the administrative record, the map labels it as section 15. The yellow lines are jurisdictional waters. That square that's got the 15 in the middle of it is one mile, based on the graphic scale that's up in the corner. This square in Save Our Sonoran is also approximately one mile, based on the scale. So that – I mean, that really gives a sense of how dense, how frequent the capillaries were in Save Our Sonoran versus – as compared to the amount of space that's available for potential development in this case. Now, I wonder if you could explain the apparent contradiction between the claim that the festival ranch development can go forward without a 404 permit and the finding in the EA that denial of the permit would prevent development, quote, in a manner that would fulfill the project purpose. I don't – I don't think that the EA finds that festival ranch can go forward. I think it finds that most of the property can be developed in the absence of a 404 permit. And indeed, as we put it – But this project, it didn't find that this project could. That the project would have to be changed. That's right.  action network. I mean, that was – it was on that basis that the district court in Wetlands Action Network said, nope, can't – if you can't build the project as proposed, then the court has jurisdiction over the whole thing. And that – this court reversed, because that's always going to be the test. If a developer comes in and says, I want a permit to build my project, and the permit is denied, then they can't build the project that they proposed. But that can't – and that can't be determinative. That's what Wetlands Action says. That's what the court's regulations say. And EPA itself acknowledged in the back and forth with the court over the project that there are over 9,000 acres of uplands that are developable here. And EPA was pushing the court to work with the developer to limit the impacts on jurisdictional waters. I hope I haven't been saying wetlands. Jurisdictional waters in this case. And over the course of the Clean Water Act public interest review process, the court and the court worked with the developer, and they reduced the amount of impact on the wetland. On the water. These are washes. I mean, I know what they are. Okay. They can be very important. But what – so they reduced it, but they didn't eliminate it. That's right. And they concluded on balance that limiting it to 26.8 acres and securing 1,047 acres of mitigation in the form of perpetual easements means protecting in perpetuity all of the other waters of the United States on the property and buffer areas around those waters was worth the tradeoff, was in the public interest, and was better than the alternative, which would be no development, no permit, but potentially lose the protections in the Hacienda River bed, which would be subject to gravel mining and other operations. I guess I would also like to respond to the comments about the relationship or the back and forth between EPA and the Corps, because I think that what this shows is not that the Corps ignored EPA, but that there was a vigorous debate that many of the objections that were initially raised by EPA were addressed in one way or another by the Corps. But at the end of the day, it's up to the Corps to make the decision on the scope of its jurisdiction and control and responsibility. EPA declined to elevate the dispute to EPA headquarters, and the Corps made its judgment. And reasonable people might differ about this, but that does not make the agency's decision in this context arbitrary and capricious. One other point, Your Honor, is the argument that the Corps used different scopes of analysis in looking at the case. And part of the problem here is that you have two or three different overlapping regulatory regimes here. In this case, the challenges go to NEPA and the NEPA analysis for the EA. And ultimately, the question in the EA is, is this going to result in significant environmental impacts? Do we need to do an environmental statement, yes or no? But apart from that, or in conjunction with that, the Corps is also doing an alternatives analysis under the Clean Water Act to determine whether there's another way to authorize a project without impacting waters of the United States. And that necessarily requires looking at more than just the permit and even more than just the projects, other projects that are not what the applicant is proposing. And then there's also the public interest analysis. What's the permit? Is it in the public interest to issue the permit? And here the agency decided based on the mitigation and other factors that it was. Thank you. Thank you. I will be very brief. I just have a couple of points I want to make. First, with respect to the Save Our Sonoran case, if I can just correct, Judge Bolton was, in fact, only the judge in that case on remand. It was Judge Martone that issued the preliminary injunction. Second, with respect, I'm kind of going in reverse order, going up my notes, but with respect to the whole debate about whether to elevate or not elevate with respect to EPA and the Memorandum of Understanding, EPA's ability to elevate is only as it relates to the 404 guidelines and the impacts on jurisdictional waters. Those got resolved, and that's why EPA rescinded its option to elevate the issue. The NEPA concerns would not be an appropriate basis for EPA to elevate the issue. So all they could do was voice their frustrations and concerns in their comments. They were not in a position to elevate over the NEPA issues. With respect to Wetlands Action Network, I think that a close reading of that case makes it very clear that what the Court is talking about, and I spent some time on this in the brief, is that the very project proposed was what was going forward and that that was significant in that case. And then finally, with respect to whether this is a Clean Air Act permit or Clean Air Act permits have to be issued and so forth for this, it's very clear under NEPA that the core in evaluating this permit is required to not just consider the impacts to the jurisdictional waters. Certainly that's a big part of the analysis under the 404 guidelines, but the NEPA analysis very clearly goes well beyond the impact to the waters and does include the impact to the air and wildlife and the overall environment. And that also comes into play in the decision-making under the Public Interest Review. The regulations are very clear that if it's contrary to the public interest, the permit shouldn't issue. And that includes if this means massive pollution, air pollution, even if there's compliance with the 404 guidelines, the court does have the authority to decline and refuse the permit. It's all kind of interrelated because this is parched land. It is all interrelated. Okay. On that note, thank you. Thank you. All right. The case just argued is submitted for decision, and that concludes the Court's calendar for this morning. The Court is adjourned.
judges: Fernandez, Nelson, Thomas